RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
MARGARET W. LAMBROSE
Assistant Federal Public Defender
Nevada State Bar No. 11626
411 E. Bonneville, Ste. 250
Las Vegas, Nevada 89101
(702) 388-6577/Phone
(702) 388-6261/Fax
Maggie_lambrose@fd.org

Attorney for Cemone Champagne Lewis

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:18-cr-055-APG-GWF |
| Plaintiff, | |
| v. | **MOTION TO SUPPRESS**[1] |
| | **(Evidentiary Hearing Requested)** |
| CEMONE CHAMPAGNE LEWIS, | |
| Defendant. | |

Cemone Lewis, through his counsel, Assistant Federal Public Defender Margaret Lambrose, requests the Court suppress all evidence and statements Las Vegas Metropolitan Police Department (LVMPD) officers obtained from the unlawful search and seizure following officers' traffic stop of Mr. Lewis on February 1, 2018.

LVMPD officers obtained the challenged evidence by violating Mr. Lewis's Fourth and Fifth Amendment rights in several ways. Frist, the officers unjustifiably prolonged Mr. Lewis's seizure and exceeded the scope of the traffic stop. The officers thus conducted a de facto arrest

---

[1] **Certification**: This Motion is timely filed.

of Mr. Lewis without probable cause to do so.  Second, Officer Deavers conducted an unreasonable frisk of Mr. Lewis.  Third, officers unlawfully searched Mr. Lewis's car.  Fourth, officers failed to *Mirandize* Mr. Lewis prior to interrogating him.   But for these multiple constitutional violations, officers would not have discovered the gun or obtained Mr. Lewis's statements about the gun.  For these reasons, all physical and testimonial evidence in this case must be suppressed as fruit of the poisonous tree.

Dated this 19th day of July, 2018.

RENE L. VALLADARES
Federal Public Defender


By:   */s/ Margaret Lambrose*
MARGARET LAMBROSE
Assistant Federal Public Defender
Attorney for Cemone Champagne Lewis

2

## <u>Memorandum of Points and Authorities</u>

### Introduction

"You **stupid motherfucker**". . ."I hope you **fuckin' rot in hell** you **piece of shit**". .. "you know what, **fuck you**". . ."you're as **dumb as they come**". . ."bye, have fun in **prison, bitch**." Imagine police officers screaming these obscenities at you after being stopped for a minor parking infraction.  Imagine officers forcing you out of your car for that parking infraction, frisking and handcuffing you against a police car.  Imagine standing there, humiliated, after an officer subjects you to a strip search and puts his hands down your pants and into your underwear behind your groin.  And, imagine all of this happening on the side of a busy street, during rush hour traffic, with cars driving by and people walking past.

Cemone Lewis did not have to imagine this.  That is what happened to him on February 1, 2018, when LVMPD officers repeatedly violated his constitutional rights.

On the late afternoon of February 1, 2018, LVMPD officers stopped Mr. Lewis as he drove on Harmon Lane in Las Vegas.  Officers allegedly stopped Mr. Lewis due to a parking infraction that occurred when Mr. Lewis was parked in a handicap space at an apartment complex.  When the officers stopped Mr. Lewis, he immediately presented them with his driver's license and vehicle documents.  The officers took the license and vehicle documents from Mr. Lewis, but tossed them into the patrol car without making any effort to issue a traffic ticket.  Instead of issuing the ticket, the officers demanded that Mr. Lewis exit his car. Mr. Lewis repeatedly questioned why he was being required to get out of his car for a parking infraction.  He received no answers.

At that point, members of LVMPD's Convention Center Area Command (CCAC) arrived.  One of the officers drew his weapon on Mr. Lewis and screamed at him to exit his car. At the same time, another officer opened the driver's side door to Mr. Lewis's car.  Mr. Lewis immediately got out of his car without incident.  Yet, officers pushed Mr. Lewis against his car, handcuffed and frisked him, and placed him against the hood of a squad car.

Instead of taking any action to issue Mr. Lewis a traffic citation, for sixteen minutes LVMPD officers searched his car, rummaging for evidence of a crime. During that time, other officers also interrogated Mr. Lewis without *Mirandizing* him and repeatedly searched him. While officers questioned Mr. Lewis and searched his car, they also muted their body worn cameras so the cameras would not record officers' investigation and conduct.

After illegally interrogating Mr. Lewis, searching his car – including unlocking and searching his glove box—and repeatedly searching Mr. Lewis, one of the officers conducted what amounted to a strip search.  One officer placed his hands down Mr. Lewis's pants, into his underwear and behind his groin area where a handgun was located.

Sixteen minutes after the initial traffic stop, with at least six officers on the scene, an officer began screaming, cursing, and degrading Mr. Lewis.

It was not until over two hours after the initial traffic stop that Mr. Lewis received his *Miranda* warnings.

LVMPD officers' conduct violated Mr. Lewis's Fourth Amendment and Fifth Amendment rights, and all evidence tainted by the officers' unlawful seizure and search must be suppressed.  Mr. Lewis seeks to suppress the gun, bullets, DNA, all other tangible and testimonial evidence stemming from the illegal seizure and search, as well as any fruits of the evidence officers unlawfully obtained.

### Factual and Procedural History[2]

On February 1, 2018, at approximately 4:30 p.m., LVMPD Officer E. Nahum was driving a marked police car in Las Vegas.  Exhibit A, Arrest Report, Bates 012.  While on

---

[2] The facts presented here are based on the discovery provided by the government.  Mr. Lewis asserts these facts for purposes of argument to support is argument regarding officers' violation of his constitutional rights and to show factual issues exist as to whether the officers violated Mr. Lewis's constitutional rights when gathering evidence.  However, Mr. Lewis does not concede any of the factual allegations and reserves the right to challenge and supplement the evidence at the requested evidentiary hearing.

4

patrol, Nahum claimed he saw a silver Infinity M45 parked in a handicap space at an apartment complex. *Id.* Nahum further claimed that he was going to issue the driver, later identified as Cemone Lewis, a parking violation but Mr. Lewis drove away before Nahum had a chance to do so. *Id.* Nahum followed Mr. Lewis to the intersection of Harmon Ave. and Koval Lane and turned on his siren. Nahum Body Worn Camera, Exhibit B at :01- :30. Mr. Lewis complied with the officer's commands and pulled over the car. Exhibit B at :01- :30; see also Deavers Body Worn Camera, Exhibit C at :01 – 15.

At that point, Nahum approached Mr. Lewis's car and advised he stopped Lewis for a parking infraction. Exhibit B at :55. Mr. Lewis had his driver's license and vehicle documents ready to present to the officers. *Id.* at 1:05-1:15. Officer Deavers took Mr. Lewis's license and vehicle documents from Nahum and threw them onto the front seat of the patrol vehicle instead of writing a citation for the parking violation. Exhibit C at 1:48 to 1:56.

After Mr. Lewis gave his license and vehicle documents to the officers, Nahum asked Mr. Lewis to roll down his back window so that Deavers could look into the car. Exhibit B at 1:10 – 1:20. Mr. Lewis complied and rolled his back window down. *Id*. Nahum then asked Mr. Lewis to exit his car. *Id*. at 1:40. Mr. Lewis asked why he needed to exit the car and stated that, as he had done nothing wrong, he was not going to exit the vehicle. *Id.* at 1:40 – 1:50. Nahum told Mr. Lewis that he needed to exit the car because, "now you're making me nervous." *Id.* at 1:40 – 1:50. Nahum then called for backup. *Id.* at 1:50 – 2:00. Officers from LVMPD CCAC unit then arrived. Officer O'Connell drew his weapon on Mr. Lewis and demanded he exit the car. Exhibit E, Gower Body Worn Camera at :30-:50. At that point, Nahum opened Mr. Lewis's driver's side door, and Mr. Lewis exited the vehicle without incident. Exhibit C at 3:27-4:00.

After Nahum opened the driver's side door, Deavers immediately handcuffed and frisked Mr. Lewis as he stepped out of the car. Exhibit B at 3:35 – 3:40. No weapons or contraband was found during that frisk and at no point did Mr. Lewis resist the officers. *Id.*

5

After handcuffing Mr. Lewis, Deavers placed him against the hood of the police car and frisked him again.  Exhibit C at 4:12 – 4:55. Deavers also asked Mr. Lewis if he had 'anything illegal on him." Exhibit C at 4:30. After Deavers conducted a full pat down search of Mr. Lewis, he asked another officer if there was "anything in there" referring to Mr. Lewis's car.  *Id* at 4:48. Officer O'Connell also asked Mr. Lewis if he had anything in the car. Exhibit E at 6:45 to 7:00. During this time, the officers never informed Mr. Lewis that he was not under arrest, nor did the officers read Mr. Lewis his *Miranda* warnings.

After seven minutes into the traffic stop, none of the officers had written Mr. Lewis a traffic ticket for the alleged parking violation. *Id*.

While the six officers on the scene continued questioning Mr. Lewis and searching his car, Nahum conducted various database checks on Mr. Lewis and Officer Gower conducted a "field interview." Exhibit E at 2:20 – 4:20, Exhibit E 10:00 –11:16; *see also* Exhibit B at 5:00-5:26.  Gower questioned Mr. Lewis about who he "gang bangs with," and asked Mr. Lewis if he was a felon.  Exhibit E at 2:20 - 4:20.  Gower also questioned Mr. Lewis about who he was visiting in the Harbor Island, where that person's apartment was located, and the friend's name who he was visiting.  Exhibit E at 5:10 – 5:40. Mr. Lewis informed the officer he was visiting a female friend of his who is a nurse.  *Id*.  Nahum also questioned Mr. Lewis about what he was doing at the Harbor Island Apartments, how long he had been in town, where he permanently resides, and where he received mail.  Exhibit B at 5:00 – 7:00.  Gower asked Mr. Lewis questions about the color of his eyes and how he normally styles his hair; he also asked for Mr. Lewis's phone number. Exhibit E at 8:10 – 12:00.   While Gower questioned Mr. Lewis, Deavers searched his jacket and pants pockets.  Exhibit E at 8:05-9:00.

6

During his database search, Nahum pulled up a CCAC bulletin regarding Mr. Lewis. Nahum then began discussing the bulletin with Officer Baily.  Exhibit B at 6:50 – 7:07.[3]  Nahum told Baily, "we saw [Lewis] when he was over there at the Harbor Island and he was parked in the handicap so we were like eh. . . ." *Id.*  At that point in officers' conversation the audio cut off because Nahum muted his body camera.  *Id.*  Nahum left his body camera on mute for the next eleven minutes.  *Id.* at 7:07 – 18:30.

After thirteen minutes into the traffic stop, none of the six officers had taken any action to write Mr. Lewis a citation for the alleged parking violation.  *Id.*

While searching Mr. Lewis's car, Officer O'Connell unlocked the glove box and searched it.  Exhibit D at 2:30 to 4:00.  One of the officers found marketing packages and a guest pass from apartment complexes in the car and proclaimed, "there you go, this establishes him being here longer than 48 hours."  Exhibit D at 4:40 - 4:47. The officers also searched the car's center console, under the seats, under the floor mats and the trunk.  Exhibit G, Jeong Body Worn Camera at 8:00 – 12:00.  While searching Mr. Lewis's car and questioning Mr. Lewis, the officers continued muting their body cameras for extended periods.[4]  *See e.g.* Exhibit C at 5:20 to 10:18.

---

[3] Counsel for the defense requested that the government provide a copy of the CCAC bulletin.  However, the government did not provide it.

[4] In the arrest report, Nahum alleged that once Mr. Lewis was out of his car, Nahum determined through a record check that Mr. Lewis had previously been issued a trespass citation in January 2018. *See* Exhibit A, Bates 012. Due to the citation, Nahum apparently contacted Detective Bragandi who informed Nahum that Mr. Lewis was "currently in violation of 179C requirements" for failing to register as a felon within 48 hours of being in Las Vegas. *Id.* Nahum's arrest report further alleged that based on his conversation with Bragandi, Mr. Lewis was then placed under arrest for the violation and searched incident to the arrest. *Id.* However, that account of events is inconsistent with the bodycamera footage that shows the officers questioning Mr. Lewis about his residence and searching his car for almost sixteen minutes before Deavers searched Mr. Lewis and located the gun.  Thus, an evidentiary hearing is necessary to develop the accurate timeline of events.

Sixteen minutes into the traffic stop, the six officers still had not written Mr. Lewis a citation for the alleged parking violation.  Exhibit C at :00 - 16:00.

After Gower questioned Mr. Lewis for approximately ten minutes, Deavers searched Mr. Lewis again for a fourth time.  Exhibit E at 13:13 – 14:20. During this search, Deavers grabbed the outside of Mr. Lewis's groin area and Deavers and Gower repeatedly asked Mr. Lewis "what he had in there." *Id*. Mr. Lewis repeatedly stated that he did not have anything. *Id*. Deavers eventually put his hands down Mr. Lewis's pants and into his underwear, locating a handgun behind Mr. Lewis's groin.  Exhibit D at 13:15-13:42.  At this point, Gower began screaming and cursing at Mr. Lewis, "what the fuck?" . . .  "you know what, fuck you" . . ."you stupid motherfucker" . . . "I hope you fuckin' rot in hell you piece of shit" . . ."you're as dumb as they come". . .  "bye, have fun in prison, bitch."[5]  *Id*.   Officer Jeong then called Mr. Lewis a motherfucker as Deavers placed him into the patrol vehicle. Exhibit G at 12:15-12:30.

Apart from the gun registered to Mr. Lewis's girlfriend, officers did not find any other weapons or contraband in Mr. Lewis's car or on him.

According to the police report, Detective Brigandi and Detective Schnuelle read Mr. Lewis his *Miranda* warnings at approximately 6:30 p.m., two hours after the stop.  *See* Exhibit A, Bates 012.  Mr. Lewis allegedly responded with a verbal, "Mmm hmm" when Brigandi asked if Mr. Lewis understood his rights.[6]  Brigandi then apparently interrogated Mr. Lewis for two and a half hours, during which he made statements about the gun being registered to his girlfriend.  Exhibit F, Voluntary Statement, Bates 33-58.

_____

[5] When Gower was done with his tirade, he muted the audio on his body worn camera. Exhibit E at 14:35.

[6] The transcript of the voluntary statement that the government disclosed to the defense does not provide the date or the time that the interrogation took place. *See* Exhibit F, Voluntary Statement, Bates 033. The only information the defense received regarding the time of the interrogation was from Nahum's arrest report. However, from the transcript of the statement it appears that the interrogation concluded at 9:00pm. Exhibit F, Bates 058.  A hearing is necessary to develop an accurate timeline.

8

Officers ultimately booked Mr. Lewis in the Clark County Detention Center at 1:04 a.m.—nine hours after Nahum and Deavers stopped him for the parking violation. Exhibit H, Booking Voucher, Bates 061. He was charged with convicted felon failure to register, carry and conceal a weapon without a permit, possession of a firearm by a prohibited person, and parking in a handicap space without a placard. *Id.*

After being released from the Clark County Detention Center, Mr. Lewis was arrested by federal marshals and charged with a single count of felon in possession of a firearm under 18 U.S.C. 922(g)(1) and 942(a)(2).  He has been in federal custody since March 5, 2018.

## Legal Argument

**A.   Officers Subjected Mr. Lewis and His Car to Warrantless Seizures and Searches, All of Which Are Presumptively Unreasonable.**

> **1.   The government bears the burden of proving Mr. Lewis's warrantless seizure and search falls within an exception to the Fourth Amendment's warrant requirement.**

"The Fourth Amendment provides in relevant part that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'"  *United States v. Jones*, 132 S. Ct. 945, 949 (2012) (quoting U.S. Const. amend. IV).  Mr. Lewis's body plainly falls within the protection of the Fourth Amendment, as does his car.  *See* id.  ("It is beyond dispute that a vehicle is an 'effect' as that term is used in the Amendment."); *United States v. Thomas*, 447 F.3d 1191, 1197 (9th Cir. 2006) ("We have previously held that the owner of an automobile has a legitimate expectation of privacy in the car, and therefore has standing to object to an unconstitutional search.").

Police seize an individual within the meaning of the Fourth Amendment "when a law enforcement officer, through coercion, physical force, or a show of authority, in some way restricts the liberty of [that] person." *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004) (internal quotation omitted).  A person's liberty is restrained when, taking into consideration "all of the circumstances surrounding the encounter, the police conduct would

9

have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Id.* (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)); *see also Brendlin v. California*, 551 U.S. 249, 251 (2007) ("When a police officer makes a traffic stop, the driver of the car is seized within the meaning of the Fourth Amendment.").

A "search" occurs, for Fourth Amendment purposes, "when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). All of the LVMPD officers' searches and seizures here took place without a warrant.  It is well-established that any search or seizure made without a warrant is per se unreasonable—subject only to a few specifically established and well-delineated exceptions. *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012); *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001).

"The burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement is on the government." *Scott*, 705 F.3d at 416 (*citing Hawkins*, 249 F.3d at 872); *see also United States v. Johnson*, 936 F.3d 1082, 1084 (9th Cir. 1991) ("The government bears the burden of justifying a warrantless search."); *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1295 (9th Cir. 1988) ("The government bears the burden to show that a warrantless seizure does not violate the Fourth Amendment.").  Furthermore, the government must prove the lawfulness of a warrantless seizure or search by a preponderance of the evidence.  *See United States v. Vasey*, 834 F.2d 782, 785 (9th Cir. 1987) ("The government must prove the existence of an exception to the Fourth Amendment Warrant Requirement by a preponderance of the evidence.").

Accordingly, it is the government's burden to show that each of the following presumptively unreasonable seizures and searches in this case were lawful:

- the officers' prolonged and unreasonable detention of Mr. Lewis beyond the duration of the initial traffic stop;

- the search of Mr. Lewis's car at the scene;

10

- the multiple frisks of Mr. Lewis after officers ordered him out of his car;

- Gower's strip search/undergarment search of Mr. Lewis.

There is little doubt the government will be unable to carry its burden with respect to these warrantless seizures and searches. Accordingly, all evidence officers obtained as a result of these Fourth Amendment violations must be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

### 2. Officers arrested Mr. Lewis without probable cause because officers' actions unjustifiably prolonged Mr. Lewis's seizure and exceeded the scope of the traffic stop.

Officers' initial traffic stop went from an investigatory detention to a full-blown arrest without probable cause when the officers handcuffed and repeatedly frisked Mr. Lewis, placed him on the hood of the squad car, searched his car, and interrogated him for approximately sixteen minutes prior conducting a strip search. Generally, a detention "involves no more than a brief stop, interrogation and, under proper circumstances, a brief check for weapons." *United States v. Miles,* 247 F.3d 1009, 1012 (9th Cir. 2001). "If the stop proceeds beyond these limitations, an arrest occurs, which requires probable cause." *Id.*

It is well settled that a "seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). "The scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500 (1983). Indeed, the "length and scope of a detention [must] be '*strictly* tied to and justified by the circumstances which rendered its initiation permissible.'" *Pierce v. Multnomah Cnty.*, 76 F.3d 1032, 1040 (9th Cir. 1996) (quoting *Terry v. Ohio*, 392 U.S. 1, 16 (1968)) (emphasis added). Importantly it is the government's burden to establish that the stop was "sufficiently limited in scope and duration." *Florida v. Royer*, 460 U.S. 491, 500 (1983).

1    Tasks not related to the mission of the stop "are therefore unlawful if they add time to

2    the stop, and are not otherwise supported by independent reasonable suspicion of wrongdoing."

3    *United States v. Evans*, 786 F.3d 779, 785-86 (9th Cir. 2015).   In *Evans*, the officer

4    impermissibly extended a traffic stop initiated for a minor traffic violation when he ran a felon

5    registration check and permitted a dog sniff.  *Id.* at 784-86.  Checking the felon registration was

6    unrelated to the mission of the stop and was a measure aimed at detecting evidence of ordinary

7    criminal wrongdoing. *Id.* Importantly, the *Evans* court noted that safety precautions taken to

8    facilitate investigation of other crimes do not stem from the mission of the stop itself and

9    therefore cannot justify its extension.  *Id.* at 786-87.  The Ninth Circuit concluded, "this kind

10   of a traffic stop for an extended period of time was an unlawful seizure… [in] violation of

11   federal law." *Id.* at 784.  Because the individual was "seized beyond the amount of time that's

12   reasonable under our constitution," the search was "an unlawful one." *Id.*

13   The *Evans* court found, "[t]he ex-felon registration check, unlike the vehicle records or

14   warrants checks, was wholly unrelated to [the officer's] 'mission' of 'ensuring that vehicles on

15   the road are operated safely and responsibly.'"  *Evans*, 786 F.3d at 786 (quoting *Caballes*, 543

16   U.S. at 408).  "Rather, it was 'a measure aimed at 'detect[ing] evidence of ordinary criminal

17   wrongdoing.'"  *Evans*, 786 F.3d at 786.  "That the ex-felon registration check occurred before

18   the officer issued a ticket is immaterial; rather, the critical question is whether the check

19   prolongs—*i.e.,* adds time to—the stop."  *Id.* at 786 (citation omitted).

20   The Ninth Circuit recognized in *Evans* that an officer may need to take certain

21   precautions to complete his traffic mission safely, but the ex-felon registration check "in no

22   way advanced officer safety." *Evans*, 786 F.3d at 787.  Safety "precautions" undertaken in order

23   to facilitate the investigation of other crimes do not stem from the mission of the stop itself and

24   therefore cannot justify extending a traffic stop.  *Id.*

25   The officers' actions here were nearly identical to the officers' actions in *Evans*.  Here,

26   like *Evans*, the officers extended the traffic stop to find evidence of criminal activity that was

unrelated to the mission of the stop, i.e. to issue a traffic ticket. Officers here unnecessarily added sixteen minutes to the stop by running database checks related to the CCAC bulletin, searching Mr. Lewis's car and his person, and conducting an extended interview, including eliciting incriminating information without *Mirandizing* Mr. Lewis.

These actions were unrelated to the purpose of the stop: to cite a driver for a minor non-moving traffic violation. Each step officers took added unnecessary and unlawful time to the length of Mr. Lewis's detention. This unjustified prolonged stop exceeded the scope of the traffic stop and violated Mr. Lewis's Fourth Amendment right to be free from unreasonable seizure. As detailed below, officers impermissibly extended the stop in several ways.

### a. Nahum added time to the stop by ordering Mr. Lewis out of the car, cuffing him, and placing him against the squad car.

Although an officer may order a passenger out of a stopped car for officer safety, the authority to do so only lasts as long as the lawfulness of the stop itself. "Unlike a general interest in criminal enforcement, . . . the government's officer safety interest stems from the mission of the stop itself." *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015). "On-scene investigation into other crimes, however, detours from that mission." *Id.* Accordingly, "an officer making a traffic stop may order passengers to get out of the car *pending completion of the stop.*" *Maryland v. Wilson*, 519 U.S. 408, 415 (1997) (emphasis added).

Here, Nahum could have completed his mission for this traffic stop as soon as Mr. Lewis provided his license and vehicle documents. However, instead of making any effort to issue Mr. Lewis a ticket and release him from his seized status, Nahum unnecessarily prolonged the stop by ordering Mr. Lewis out of the vehicle, handcuffing him, and placing him against the police squad car while the officers conducted investigation unrelated to the stop. *See Evans*, 786 F.3d at 786.

b.     **Officers added time to the stop by illegally searching the car.**

Officers' actions when searching Mr. Lewis's car also unreasonably extended the length of the stop.  Conducting a full search of the car, including the locked glove box, was not a "negligibly burdensome precaution" meant to complete the officers' mission safely.  *Evans*, 786 F.3d at 787.  Such a search was completely unrelated to the mission of writing a ticket for a parking violation and ensuring the safety of automobiles on the road.  *Id.* at 786-87.  There was simply no justification for extending the stop in this manner.

c.     **Officers added time to the stop by running database checks and conducting a prolonged field interview.**

The seizure for a traffic stop remains lawful only "so long as [unrelated] inquiries do not measurably extend the duration of the stop."  *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).  Under *Rodriguez*, 135 S. Ct. 1609, and its progeny, Nahum was permitted to ask Mr. Lewis for identification, run his name to check for warrants, and ask questions so long as those questions did not prolong the stop.  However, there was no reason for Nahum to run any database checks unrelated to officer safety—those checks were wholly unrelated to LVMPD's mission of ensuring vehicles on the road are operated safely and responsibly, and "in no way advanced officer safety."  *Evans*, 786 F.3d at 786, 787.

Gower also extended the time of the stop by questioning Mr. Lewis about his eye color, his hairstyle, his phone number, his work as a musician, his criminal history, and who he was visiting at the apartment complex.  These questions were unrelated to the traffic stop, unrelated to officer safety, and unreasonably added time to the stop.

The ancillary database searches pertaining to the CCAC bulletin were run simply to detect evidence of criminal wrongdoing and impermissibly added time to the stop.  In essence, the officers unlawfully prolonged the length and exceeded the scope of the traffic stop.  Instead of attempting to take any steps necessary to the mission of the traffic stop, i.e. writing a citation, the officers instead ordered Mr. Lewis out of his car at gunpoint, frisked him repeatedly, and

14

handcuffed him.  They then moved him to the hood of one of the patrol vehicles.  There they searched Mr. Lewis's car looking for evidence of a crime while questioning him about matters wholly unrelated to the stop or officer safety.

For these reasons, it is clear that the detention, which went well beyond the duration of the initial traffic stop, was prolonged and unreasonable.

> **3.      Deavers did not possess specific, articulable facts that Mr. Lewis was armed and presently dangerous to justify subjecting Mr. Lewis to multiple frisks and reaching into his underwear and underneath his groin area.**

"The Fourth Amendment guarantees 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'"  *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012) (quoting U.S. Const. amend.  IV) (brackets omitted).  Under *Terry*, the "Fourth Amendment permits brief investigative stops when a law enforcement officer has reasonable suspicion that the person stopped is engaged in criminal activity." *United States v. Williams*, 846 F.3d 303, 308 (9th Cir. 2017).  "This means the officer must have reasonable suspicion 'the person apprehended is committing or has committed a criminal offense.'"  *Thomas v. Dillard*, 818 F.3d 864, 874-75 (9th Cir. 2016) (quoting *Johnson*, 555 U.S. at 326).

In a traffic-stop setting, police may detain an automobile and its occupants pending inquiry into a vehicular violation based on reasonable suspicion.  *Johnson*, 555 U.S. at 327. "To justify a pat-down of the driver or a passenger during a traffic stop, however, just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous."  *Id.*

"A frisk for weapons is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." *Thomas*, 818 F.3d at 876 (internal quotation marks omitted).  Thus, reasonable suspicion

supporting a *Terry*-type stop of a vehicle does not necessarily give police reasonable suspicion to pat down the driver:

> [W]hereas a *Terry* stop is justified by reasonable suspicion that criminal activity may be afoot, a frisk of a person for weapons requires reasonable suspicion that a suspect is armed and presently dangerous to the officer or to others.  A lawful frisk does not always flow from a justified stop.  Rather, each element, the stop and the frisk, must be analyzed separately; the reasonableness of each must be independently determined.

*Thomas*, 818 F.3d at 876 (brackets, internal quotation marks, and citations omitted).

"Reasonable suspicion is an objective standard, asking whether a reasonably prudent person would have been warranted in believing the suspect was armed and thus presented a threat to the officer's safety while he was investigating his suspicious behavior." *Thomas*, 818 F.3d at 876 (brackets and internal quotation marks omitted).  "To establish reasonable suspicion a suspect is armed and dangerous, thereby justifying a frisk, the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.*  In other words, a determination of reasonable suspicion must be grounded in hard facts:

> A mere inchoate and unparticularized suspicion or hunch that a person is armed and dangerous does not establish reasonable suspicion, and circumstances suggesting only that a suspect would be dangerous *if* armed are insufficient.  There must be adequate reason to believe the suspect *is* armed.

*Id.* (italicized emphasis in original) (internal quotation marks omitted).

Here, the government cannot provide articulable, particularized facts to establish a reasonable suspicion that Mr. Lewis, while handcuffed, was presently armed and dangerous when Deavers patted him down at least four separate times.  Mr. Lewis committed a minor, non-moving traffic violation that prompted the car stop.  He immediately provided Nahum with his vehicle documents and driver's license.  When Mr. Lewis asked why Nahum wanted him to get out of the car, Nahum responded, "now you are making me nervous."  This general and conclusory statement regarding "officer safety" does not provide specific, articulable,

16

particularized facts that support a reasonable suspicion that Mr. Lewis was armed and dangerous. *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1022 (9th Cir. 2009) (holding pat-down not justified where officer merely made "conclusory reference" to "officer safety").

### 4.    Deavers invasively searched Mr. Lewis's body, exceeding the constitutionally permissible bounds of a *Terry* frisk.

In addition to prolonging the stop and conducting multiple *Terry* frisks, Deavers exceeded *Terry*'s permissible scope by putting his hands down Mr. Lewis's pants and into his underwear despite not feeling anything during the previous frisks.

A *Terry* frisk must be "confined in scope to an intrusion reasonably designed to discover" hidden weapons. *Terry*, 392 U.S. at 29. An officer should begin a *Terry* search by "pat [ting] down a suspect's outer clothing and feel[ing for] an object whose contour or mass makes its identity immediately apparent." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). A search exceeds the proper scope if "the incriminating character of [an item is] not immediately apparent" but is discovered "only as a result of a further search." *Id.* at 379.

Accordingly, to legitimize a search underneath a suspect's clothing, an officer must reasonably believe, based on the frisk, that weapons could still be present. *See, e.g., I.E.V.*, 705 F.3d at 440-41; *United States v. Miles*, 247 F.3d 1009, 1014 (9th Cir. 2001) (emphasizing that *Dickerson's* "immediately apparent" rule applies once the officer reasonably determines that he has not felt a weapon).

Thus, setting aside for a moment the illegality of Mr. Lewis's arrest at the scene of the traffic stop, officers exceeded the permissible scope of a search incident to arrest. The "'full search' authorized by [the search-incident-to-arrest cases] [i]s limited to a pat-down and an examination of the arrestee's pockets, and d[oes] not extend to a strip search or bodily intrusion." *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1446 (9th Cir. 1991). The Ninth Circuit's search-incident-to-arrest cases "simply d[o] not contemplate the significantly greater intrusions involved in strip . . . searches." *Id.; see also Illinois v. Lafayette*, 462 U.S. 640, 645 (1983)

("[T]he interests supporting a search incident to arrest would hardly justify disrobing an arrestee on the street.).”

Deavers subjected Mr. Lewis to a strip search by reaching down into his pants and then reaching inside his underwear.[7]  When an officer instructs a suspect "to drop his trousers and pull down his underwear," he commits an invasion "more intrusive than [the] pat-down search" permitted by the search-incident-to-arrest exception.  *United States v. Vance*, 62 F.3d 1152, 1156 (9th Cir. 1995); *see also Edgerly v. City & Cty. of S.F.,* 599 F.3d 946, 947 (9th Cir. 2010) ("[V]isually inspecting an arrestee's naked body, even without a visual examination of body cavities, constitutes a strip search.").  The Ninth Circuit held in *Edgerly* that the jury could conclude an officer engaged in a strip search where he "required [the defendant] to arrange his clothing so as to permit a visual inspection of his undergarments, by asking him to pull his pants down to his ankles," and then "placed his finger within [the defendant's] boxers and kind of just looked around. *Id.* at 958. Deavers's repeated prodding and manipulation of Mr. Lewis's underwear and groin area were at least as invasive as the police conduct in *Edgerly*.  The "strip search" exceeded a "pat-down" and therefore violated Mr. Lewis's Fourth Amendment rights. *Fuller*, 950 F.2d at 1446.

> **5.     This Court should suppress all fruits of the unconstitutional prolonged seizure and illegal arrest.**

Evidence police seize as a result of a Fourth Amendment violation must be suppressed. *See, e.g., Wong Sun*, 371 U.S. 471.  This exclusionary rule prohibits the government from introducing evidence directly obtained in violation of the defendant's constitutional rights.

---

[7] This search took place while Mr. Lewis was handcuffed. Having already used significant force to secure the scene for safety purposes, the officers cannot leverage the safety rationale into a justification for a full-scale search. The search exceeded the "strictly circumscribed" limits of *Terry. Miles,* 247 F.3d at 1015.

18

*Murray v. United States*, 487 U.S. 533, 536 (1988) (internal citations omitted).  Furthermore, [i]t is fundamental that the exclusionary rule extends beyond evidence directly obtained in violation of the Fourth Amendment to the 'fruit of the poisonous tree.'"  *United States v. Johns*, 891 F.2d 243, 245 (9th Cir. 1989).  Thus, "the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful seizure. . . ."  *Murray*, 487 U.S. at 536-37.

"The focus is on the causal connection between the illegality and the evidence; and, the burden of showing admissibility rests on the prosecution."  *Johns*, 891 F.2d at 245.  The test is whether "the illegal activity tends to significantly direct the investigation to the evidence in question." *Id.*  If there is a Fourth Amendment violation, the government must demonstrate there was a "break in the chain of events sufficient to refute the inference that" the evidence obtained was a product of the illegal stop.  *United States v. Twilley*, 222 F.3d 1092, 1097 (9th Cir. 2000)

Given the unconstitutionally the prolonged detention (leading to a de facto arrest) and illegal search of Mr. Lewis's car and his person, this Court should suppress all evidence officers directly obtained by violating Mr. Lewis's Fourth Amendment rights.  This includes the gun seized Mr. Lewis's groin area, all of Mr. Lewis's statements, the DNA officers collected from Mr. Lewis, all evidence tainted by the constitutional violations, and fruits thereof.

### 6.       Fifth Amendment Violation

*Miranda* warnings are necessary when police interrogate a suspect in custody. *Thompson v. Keohane*, 516 U.S. 99, 102 (1995).  Custodial interrogation occurs when officers initiate questioning after a person is taken into custody or deprived of his freedom. *United States v. Butler*, 249 F.3d 1094, 1098 (9th Cir. 2001) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).  In determining whether a suspect was in custody for *Miranda* purposes, courts determine whether there was a formal arrest or restraint on freedom of movement to the degree

associated with formal arrest. *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). The analysis considers whether a reasonable person in the suspect's position would have felt deprived of his freedom of action in any significant way, such that he would not have felt free to terminate the interrogation." *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008).

In addition to being in custody, the individual must also be subject to interrogation to trigger the *Miranda* requirement. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). Interrogation means questioning or "its functional equivalent," including "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. 291 at 301. An "incriminating response" is any response, whether inculpatory or exculpatory, that the prosecution may seek to introduce at trial. *Id.* at 302.

Whether the questioning constitutes an interrogation is an objective test focusing on the perception of the defendant. The officer's subjective intent in asking the questions is relevant, but not determinative. *See*, *e.g.*, *United States v. LaPierre*, 998 F.2d 1460, n.6 (9th Cir. 1993); *Innis*, 446 U.S. at 301-02.

Here, Neham and Deavers ordered Mr. Lewis out of the car, handcuffed him and ordered him to stand at the hood of the patrol car. At that point Mr. Lewis was arrested or at a minimum deprived for his movement to the degree associated with an arrest. *Miranda* warnings were required before any officer could initiate questioning from that point forward.

While officers unlawfully searched the car, Nehum and Gowers asked a series of questions of Mr. Lewis likely to elicit an incriminating response. Ex. B at 15:12-15:30 ("Do you have anything on you? . . . Is there anything in the car? Are you a felon? . . . How long have you been in Las Vegas?. . . . Where do you live?. . . Where do you receive mail?. . . Who do you gang bang with?. . . What gang are you in?. . .). Questions about whether Mr. Lewis had anything on him or whether there was anything in the car clearly elicited an incriminating

response.  Furthermore, questions about whether Mr. Lewis was a felon, how long he had been in Las Vegas, and where he currently lived were also intended to elicit an incriminating response as felons are required to register within 48 hours of being in Nevada and failure to do so is a misdemeanor offense.[8]

Here, the government cannot prove Mr. Lewis received adequate *Miranda* warnings and validly waived his rights *before* officers interrogated him.  As evidenced by LVMPD's own reports, Brigandi did not *Mirandize* Mr. Lewis until around 6:30 p.m two hours after he was formally arrested.  *See* Exhibit A, Bates 012.[9]  When Brigandi finally read Mr. Lewis his *Miranda* warnings at Mr. Lewis allegedly responded with a verbal, "Mmm hmm."

Accordingly, an evidentiary hearing is necessary to determine when Mr. Lewis was Mirandized and whether Mr. Lewis made a voluntary, knowing, and intelligent waiver of his rights.  The government bears the great burden of proving *Miranda* warnings are sufficient for a defendant to make a voluntary, knowing and intelligent waiver of his *Miranda* rights. *United States v. Garibay*, 143 3.d 534, 536 (9th Cir. 1998). "The government's burden to make such a showing is great, and the court will indulge every reasonable presumption against waiver of fundamental constitutional rights."  *Garibay*, 143 F.3d at 537.

An evidentiary hearing is also necessary for the Court to determine a basic timeline of events.  The government's discovery fails to explain why Mr. Lewis was not Mirandized for at least two hours after his arrest or why he was held at the scene from 4:30 p.m. until approximately 1:00 a.m.

---

[8] *See* NRS 179C.100.

[9] It is unclear what time the formal interrogation took place as the transcript from Mr. Lewis's statement does not provide the date or time when it began.  However, it apparently ended at 9:00 p.m.  A hearing is necessary to determine the timeline of the interrogation.

21

## Conclusion

For these reasons, Mr. Lewis respectfully requests this Court grant the Motion to Suppress.

Dated this 19th day of July, 2018.

RENE L. VALLADARES
Federal Public Defender


By:   */s/ Margaret Lambrose*
MARGARET LAMBROSE
Assistant Federal Public Defender
Attorney for Cemone Champagne Lewis


## Index of Exhibits

| A | LVMPD Arrest Report, 02/01/2018 |
|---|---|
| B | Bodycam Video of Officer Neham |
| C | Bodycam Video of Officer Deavers |
| D | Bodycam Video of Officer O'Connell |
| E | Bodycam Video of Officer Gowers |
| F | Transcript of Voluntary Statement, 02/01/2018 |
| G | Bodycam Video of Officer Jeong |
| H | Booking Voucher, 02/02/2018 |

1

**CERTIFICATE OF ELECTRONIC SERVICE**

2          The undersigned hereby certifies that she is an employee of the Federal Public Defender

3    for the District of Nevada and is a person of such age and discretion as to be competent to serve

4    papers.

5          That on July 19, 2018, she served an electronic copy of the above and foregoing

6    **MOTION TO SUPPRESS** by electronic service (ECF) to the person named below:

7

8                    DAYLE ELIESON
                     United States Attorney
9                    PHILLIP N. SMITH, JR.
                     Assistant United States Attorney
10                   501 Las Vegas Blvd. South
                     Suite 1100
11                   Las Vegas, NV 89101

12                                    */s/ Stephanie Young*
13                                    Employee of the Federal Public Defender

14

15

16

17

18

19

20

21

22

23

24

25

26

23